UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPERATING ENGINEERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PRECISION DRILLING, INC.,<br><br>Defendant. | Case No. 21-cv-07893-EMC<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**<br><br>Docket No. 51 |

Plaintiffs are various Operating Engineers Trust Funds. They have filed suit against Precision Drilling, Inc. ("PDI") for violations of, *inter alia*, ERISA – specifically, on the basis that the company failed to permit audit of its records and make required contributions. Currently pending before the Court is Plaintiffs' motion for default judgment. Having considered the papers submitted, the Court hereby **GRANTS** Plaintiffs' motion.

## I.   FACTUAL & PROCEDURAL BACKGROUND

A.   Relevant Agreements

In support of their motion for default judgment, Plaintiffs have provided copies of several agreements.

1.   Memorandum Project Agreements

During the relevant period, PDI entered into three Memorandum Project Agreements ("MPAs") with the Operating Engineers Local No. 3 of the International Union of Operating Engineers, AFL-CIO ("Union").

- The first MPA (covering the Contra Costa Blvd. Rehabilitation Project) was entered into on or about May 1, 2014.

- The second MPA (covering the Positive Train Control System Caltrain project) was entered into on or about December 8, 2014.
- The third MPA (covering the Highway 70 Widening in Butte County) was entered into on or about September 9, 2019.

*See* Brown Decl. ¶¶ 3-5 & Exs. A-C (MPAs).

Pursuant to each MPA, PDI agreed to be bound by "the wage rates, fringe benefit rates, hours and all other terms and conditions of employment contained in the current Master Construction Agreement for Northern California between the SIGNATORY ASSOCIATIONS[] and [the Union], and any successor agreements thereto which may be in effect during the Project." Brown Decl., Exs. A-C (footnote omitted).

2.  Master Agreements

The Master Agreements for the periods 2013-2016, 2016-2020, 2020-2023, and 2023-2026 can be found at Exhibits D-F to the Brown Declaration. *See* Brown Decl., Exs. D-G (Master Agreements).

Under each Master Agreement, an employer is required to make certain contributions to certain Trust Funds, including the ones at issue in the case at bar. *See, e.g.*, Brown Decl., Ex. D (Master Agreement § 12.01.00) ("The Individual Employer will make the following payments for each hour worked or paid each Employee by an Individual Employer covered by this Agreement."). If there are delinquent contributions (*e.g.*, a late payment or an underpayment), *see, e.g.*, Brown Decl., Ex. D (Master Agreement § 12.01.01), liquidated damages and interest are assessed. *See, e.g.*, Brown Decl., Ex. D (Master Agreement §§ 12.13.01, 12.13.02).

- Liquidated damages are 10% of the unpaid contributions; however, if a lawsuit to collect delinquent contributions has to be filed, the liquidated damages amount increases to 20% of the unpaid contributions or interest on the amount of unpaid contributions (whichever is greater). *See, e.g.*, Brown Decl., Ex. D (Master Agreement § 12.13.01).
- With respect to interest, the interest is simple interest at the rate of 10% per year. *See, e.g.*, Brown Decl., Ex. D (Master Agreement § 12.13.02).

2

Each Master Agreement further provides that the Union or the Trust Funds may require an employer to "submit to them for examination, any information relevant to the administration of the Trust Funds, to confirm the Individual Employer's reporting compliance." Brown Decl., Ex. D (Master Agreement § 12.01.04).

In addition, each Master Agreement provides that, if an employer defaults in making contributions and if the Union or Trust Funds consults with counsel or files suit as a result, "there shall be added to the obligation of the Employer who is in default all reasonable expenses incurred by the Union and the Trust Funds in the collection of the same, including but not limited to, reasonable attorneys' fees . . . ." Brown Decl., Ex. D (Master Agreement § 12.13.06).

Finally, the Master Agreements specify that they incorporate the terms of the relevant Trust Agreements. *See, e.g.*, Brown Decl., Ex. D (Master Agreement § 12.01.03) ("Each Individual Employer is bound by all the terms and conditions of each Trust Fund's Trust Agreement and any amendment thereto whether adopted before or after this Agreement, all of which documents are incorporated hereby in reference.").

### 3. Trust Agreements

An exemplar Trust Agreement can be found at Exhibit H to the Brown Declaration. *See* Brown Decl. ¶ 9 & Ex. H (Trust Agreement).

Similar to the Master Agreements, the Trust Agreements include a provision that essentially allows for an audit. *See, e.g.*, Brown Decl., Ex. H (Trust Agreement § 6) ("Reasonable cause appearing therefor upon notice in writing from the Board, a Contributing Employer must permit a certified public accountant appointed by the Board to enter upon the premises of such employer during business hours, at all reasonable time or times, and to examine and copy such books, records, papers or reports of such Contributing Employer as may be necessary to determine whether such Contributing Employer is making full and prompt payment of all sums required to be paid by him or it to this Fund.").

The Trust Agreements also include provisions related to delinquent contributions and the assessment of liquidated damages and interest related thereto. *See* Brown Decl., Ex. H (17th Amendment to the Trust Agreement) (addressing § 10).

B.  Complaint

In their complaint, Plaintiffs allege as follows:

(1) In accordance with the above agreements, PDI was asked to comply with an audit for the period January 2014 through December 2017, but it failed to comply. *See* Compl. ¶ 14.

(2) In addition, PDI failed to report and pay contributions for hours worked by its employees "during the months of January 2018 through May 2018, August 2018 through November 2018, February 2019, and December 2019 through August 2021." Compl. ¶ 15.

(3) Finally, PDI made contributions for the month of September 2019 but the contributions were late such that it owes liquidated damages and interest. *See* Compl. ¶ 15.

In terms of relief, Plaintiffs ask for, *inter alia*, an order requiring PDI to comply with the audit and paying any unpaid contributions, liquidated damages, interest, and attorneys' fees.

C.  Plaintiffs' Communications with Defendant Pre- and Post-Litigation

Plaintiffs have provided evidence indicating that they attempted to resolve their dispute with PDI both before and after filing this lawsuit.

In or about May 2018, Plaintiffs first informed PDI via letter of their desire to conduct an audit covering the period January 2014 through December 2017. *See* Brown Decl. ¶ 16 & Ex. I (letter, dated May 11, 2018) ("Your company has been selected for an examination of your payroll records at this time. Your inspection period is from **January 1, 2014** through **December 31, 2017**.") (emphasis in original); *see also* Quackenbush Decl. ¶¶ 3-4 & Ex. A (same). From October to December 2018, Plaintiffs continued to contact PDI about an audit but PDI did not respond until December 10, 2018. *See* Quackenbush Decl. ¶¶ 5-9. Although PDI indicated at that time that it would comply with the audit, it did not thereafter comply, even after Plaintiffs made several follow-ups in January and February 2019. *See* Quackenbush Decl. ¶¶ 10-12.

In December 2019, Plaintiffs referred the matter to legal counsel. *See* Quackenbush Decl. ¶ 14; Jhans Decl. ¶ 4. It is not clear what action legal counsel took on the referral until August

4

2020 when counsel began to look, *e.g.*, into PDI's contact information and its status with the California Contractors State License Board. *See* Jhans Decl. ¶¶ 8-10. In that same month, and later in February 2021, legal counsel reiterated the demand for an audit. *See* Jhans Decl. ¶¶ 11-12.

In October 2021, after being informed that PDI still had not complied with the audit request, legal counsel filed the instant suit on behalf of Plaintiffs. *See* Jhans Decl. ¶ 13; *see also* Docket No. 1 (complaint). The complaint was served on PDI in March 2022. *See* Docket No. 18 (proof of service). After PDI failed to timely respond, the Clerk of the Court entered PDI's default (upon motion by Plaintiffs) in May 2022. *See* Docket No. 22 (notice).

Thereafter, for more than a year, Plaintiffs indicated to the Court that they intended to move for a default judgment.

In or about December 2023, Plaintiffs' legal counsel learned that PDI was being represented by an attorney in a different legal proceeding. *See* Jhans Decl. ¶ 17. Plaintiffs' counsel successfully reached defense counsel, who indicated that there would be compliance with an audit. However, after January 2024, defense counsel no longer responded to Plaintiffs' follow-up communications. *See* Jhans Decl. ¶¶ 18-30. Plaintiffs thus filed a motion for default judgment in April 2024.

In May 2024, PDI made an appearance in this case for the first time, filing an answer to Plaintiffs' complaint. *See* Docket No. 58 (answer). PDI, however, did not move to set aside the default that had been entered against it. Notwithstanding such, in light of PDI's appearance, the Court ordered the parties to meet and confer to see if they could reach agreement on how the case should proceed. *See* Docket No. 61 (order). No agreement was reached, and thus Plaintiffs filed a motion to strike PDI's answer. *See* Docket No. 62 (motion). The Court deferred ruling on the motion to strike so as to give PDI the opportunity to comply with the audit sought by Plaintiffs. The Court indicated that, if PDI did not cooperate and comply with the audit, then it would grant Plaintiffs' motion to strike and then allow Plaintiffs to move forward with their motion for default judgment. *See* Docket No. 78 (minute order).

PDI did not provide documents in response to the audit. The Court held a hearing in September 2024 and essentially gave PDI another opportunity to comply with the audit. *See*

5

1 Docket No. 88 (minute order). After PDI again failed to comply, the Court granted Plaintiffs'
2 motion to strike and allowed them to renew their motion for default judgment. *See* Docket Nos.
3 93 (order). Plaintiffs' renewed motion is now pending before the Court.

## II. DISCUSSION

A. Adequacy of Service of Process

As a preliminary matter, the Court must first "'assess the adequacy of the service of process on the party against whom default is requested.'" *Bd. of Trs. v. Charles B. Harding Constr., Inc.*, No. C-14-1140 EMC, 2014 U.S. Dist. LEXIS 175680, at *5 (N.D. Cal. Dec. 18, 2014).

Plaintiffs initiated this lawsuit in October 2021. *See* Docket No. 1 (complaint). In March 2022, they served a copy of the summons and complaint, via personal delivery, on Tyrone Dennis Amundson. *See* Docket No. 18 (proof of service). Filings with the state of California indicate that Mr. Amundson is PDI's CEO/President as well as its agent for service of process. *See* Minser Decl., Exs. A, C (filings made with the Contractors State License Board and Secretary of State). Service by this means comported with Federal Rule of Civil Procedure 4(h). *See* Fed. R. Civ. P. 4(h)(1)(B) (providing that a corporation may be served "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive services of process"). Accordingly, the Court concludes that service of process on PDI was properly effected. The Court also notes that PDI has made an appearance in this case and never contested service.

B. Merits of Motion for Default Judgment

In May 2022, after PDI failed to respond to the complaint, Plaintiffs moved for entry of default. *See* Docket No. 19 (motion). The Clerk of the Court entered PDI's default on May 10, 2022. *See* Docket No. 22 (notice).

After entry of default, a court may grant a default judgment on the merits of the case. *See* Fed. R. Civ. P. 55. "The district court's decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir.1980). A court may consider the following factors in exercising such discretion:

6

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). Because default has already been entered in this case, the Court must construe as true all of "the factual allegations of the complaint, except those relating to the amount of damages." *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987).

The *Eitel* factors weigh in favor of granting default judgment. For example, as to the first factor, if the motion for default judgment were to be denied, then the Trust Funds would likely be prejudiced as they would be left without a remedy. *See Walters v. Shaw/Guehnemann Corp.*, No. 03-cv-04058, 2004 U.S. Dist. LEXIS 11992, at *7 (N.D. Cal. Apr. 15, 2004) ("To deny plaintiff's motion [for default judgment] would leave them without a remedy. Prejudice is also likely in light of the merits of their claims."); *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D.Cal.2002) ("If Plaintiffs' motion for default judgment is not granted, Plaintiffs will likely be without other recourse for recovery.").

As for the fourth *Eitel* factor, the sum of money at stake in this action is appropriate for resolution on default judgment, particularly because the amount sought is narrowly tailored to PDI's specific misconduct. *See Pepsico*, 238 F.Supp.2d at 1176 (stating that "the court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct").

As to the fifth, sixth, and seventh *Eitel* factors, because the Court has stricken PDI's answer, there is nothing to suggest that there is a possibility of a dispute concerning material facts. Nor is there any indication that PDI's default was due to excusable neglect given the history of proceedings discussed above. And while public policy favors decisions on the merits, *Eitel*, 782 F.2d at 1472, PDI's conduct to date renders a decision on the merits "impractical, if not impossible."[1] *PepsiCo*, 238 F. Supp. 2d at 1177.

---

[1] The Court acknowledges PDI's opposition brief, in which it makes a number of arguments – *e.g.*, that PDI's employees were covered by different labor agreements; that the MPAs identified above

7

The only remaining factors that warrant additional analysis are the second and third *Eitel* factors – the merits of Trust Funds' substantive claims and the sufficiency of those claims. The agreements referenced above (the MPAs, Master Agreements, and Trust Agreements) establish that PDI had an obligation to comply with an audit and to make contributions to the Trust Funds. Plaintiffs have alleged, and the Court must accept as true, *see TeleVideo*, 826 F.2d at 917, that PDI has failed to comply with an audit, has failed to report and pay contributions, and has failed to pay liquidated damages and interest for a late-made contribution. Thus, Plaintiffs have successfully stated a claim for relief pursuant to case law, statute, and/or contract. *See, e.g.*, *Central States, Southeast & Southwest Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 571 (1985) (stating that "[a]n examination of the structure of ERISA in light of the particular duties and powers of trustees under the common law leaves no doubt as to the validity and weight of the audit goals[;] ERISA clearly assumes that trustees will act to ensure that a plan receives all funds to which is it entitled, so that those funds can be used on behalf of participants and beneficiaries"); 29 U.S.C. § 1132(g)(2) (providing that, pursuant to ERISA, "[i]n any action . . . by a fiduciary for or on behalf of a plan to enforce section 1145 . . . , the court shall award the plan [*inter alia*] the unpaid contributions"); *Trs. of the Bricklayers Local No. 3 Pension Trust v. Huddleston*, No. 10-1708 JSC, 2013 U.S. Dist. LEXIS 71346, *14-15 (N.D. Cal. May 20, 2013) (stating that, if a collective bargaining agreement "provides for damages on delinquencies" such as late payments, "as a matter of contract law, Plaintiffs may be entitled to liquidated damages").

Taking into account the above, the Court concludes that the *Eitel* factors weigh in favor of a default judgment.

---

were not signed by PDI's co-owners but rather by unauthorized individuals; that the MPAs were signed out of "duress or misunderstanding to avoid disruptions on job sites"; that the scope of the audit is unreasonable, especially as records dating back to 2014 are sought; and that PDI no longer has many of the records sought because it ceased operations during the COVID pandemic. *See* Opp'n at 3-4. The Court would be well within its rights to disregard the opposition brief in its entirety because it was not timely filed. But the bigger problem for PDI is that the time to, *e.g.*, raise a dispute concerning material facts has well passed. The Court gave PDI multiple opportunities to comply with an audit and to have the default set aside. PDI squandered those opportunities, and therefore it cannot now try to raise a dispute to prevent a default judgment. In any event, because the primary relief granted in the default judgment herein is an order requiring compliance with an audit, the audit may provide PDI with a forum in which it can raise some of the issues affecting the extent of its liability.

8

C.      Damages and Other Relief

Because the Court concludes that default judgment is warranted, it must determine what damages or other relief is appropriate. Plaintiffs have the burden of "proving up" their damages or the need for other requested relief. *See Harding*, 2014 U.S. Dist. LEXIS 175680, at *11-12.

In their motion for default judgment, Plaintiffs seek: (1) to recover liquidated damages and interest on a late-paid contribution (from September 2019), which was assessed prior to the filing of Plaintiffs' suit; (2) an order requiring PDI to comply with an audit to ensure that it has paid all sums owed for the period January 2014 through December 2021; and (3) attorneys' fees incurred both before and during this litigation related to, in particular, Plaintiffs' attempt to get PDI to comply with the audit.

The relief sought in (1) is appropriate. As indicated above, Plaintiffs are entitled to liquidated damages and interest on a late-paid contribution as a contractual matter. Plaintiffs have provided evidence to support there being a late contribution for September 2019, liquidated damages in the amount of $373.56, and interest in the amount of $312.13. *See* Brown Decl. ¶ 21 (indicating that PDI's September 2019 contribution in the reported amount of $3,735.60 became delinquent on October 25, 2019, and that PDI did not pay the contribution until August 25, 2020; also providing the liquidated damages and interest for the late-paid contribution).

The relief sought in (2) is also appropriate in light of *Central States*. At the hearing, the Court did express concern that, in the complaint, Plaintiffs sought an audit for the years 2014-2017 only, whereas, in the pending motion, Plaintiffs ask for an audit to cover a broader period – *i.e.*, 2014 through 2021.[2] *See* Docket No. 101-7 (Prop. Order). Typically, a motion for default judgment cannot seek relief different in kind from that implicated by the operative complaint. As

---

[2] At the hearing, Plaintiffs argued that ¶ 16 of the complaint indicated that an audit could cover a broader time period. *See* Compl. ¶ 16 ("Plaintiffs reserve the right to conduct a further audit to determine whether there are any additional amounts due from Defendant."). The Court need not address whether ¶ 16, by itself, put PDI on notice of a broader audit. Paragraph 16 does, however, render the broader time period now sought by Plaintiffs consistent with the complaint.

The record indicates that, at the very least, PDI was given clear notice of a broader audit in August 2024. *See* Brown Decl. ¶ 19 ("Given that over six years had passed from the date that I issued the May 11, 2018 audit Notification Letter, in August 2024, the payroll inspection period was expanded to January 1, 2014 through December 31, 2021.").

Federal Rule of Civil Procedure 54(c) states, "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings. Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c).

> The rationale for applying a different rule to default judgment cases is that default is tantamount to consent to the entry of judgment, but this consent is effectively only to the extent that it was duly informed. If greater relief had been demanded, the defendant might have entered the action and defended on the merits, both as to liability and the requested relief.

Moore's Fed. Prac. – Civ. § 54.71[1]. The Moore's treatise, however, recognizes that "there may be instances in which this rationale . . . would be inapplicable. For instance, the defendant, though in default, may have actually opposed or had a meaningful opportunity to oppose the additional relief sought, in which case the court may award relief beyond that in the demand for judgment." *Id. See, e.g.*, *In re Dierschke*, 975 F.2d 181, 185 (5th Cir. 1992) (noting that complaint did not request an award of attorney's fees, but before a judgment was entered for attorney's fees, defendant had notice, appeared, and opposed the award); *Appleton Elec. Co. v. Graves Truck Line, Inc.*, 635 F.2d 603, 610-11 (7th Cir. 1980) (holding that Rule 54(c) was not violated because "the proposed default order which was served upon [defendant] amounted to an amendment of the plaintiffs' prayer for relief").

The Court concludes that the instant case is one in which relief beyond that in the demand for judgment is appropriate. PDI has been aware of the request for a broader audit since at least August 2024. *See* note 2, *supra*. The request for a broader audit was repeated in Plaintiffs' motion for a default judgment. PDI had an opportunity to comment on the request for a broader audit at the hearing on the motion. Moreover, having an audit extend through 2021 is not inconsistent with the complaint which included allegations that PDI failed to report and pay contributions for hours worked by its employees "during the months of January 2018 through May 2018, August 2018 through November 2018, February 2019, and December 2019 through August 2021." Compl. ¶ 15. Taking into account all of the above, the Court holds that an audit covering the broader time period is justified.

1  Finally, the Court addresses the request for attorneys' fees.  Plaintiffs seek $42,322 in attorneys' fees and costs of $3,141.70.  In support of the fee request, Plaintiffs have provided evidence about their attorneys' and related staff's hourly rates, *see* Jhans Decl. ¶ 51 (indicating that partner/shareholder hourly rate ranged from $250-375, associate hourly rate ranged from $245-375, and paralegal hourly rate ranged from $135-205), as well as evidence about the number of hours spent on this case.  *See* Jhans Decl. ¶ 53 & Ex. M (indicating that attorney time was 114.5 hours and paralegal time 50 hours, for a total of 164.7 hours).  Plaintiffs have further provided evidence to support the costs requested.  *See* Jhans Decl. ¶ 54 & Ex. N (indicating that costs included "legal research, the Complaint filing fee, Investigation, and Service of Process fees, including costs of a Stakeout of Defendant's CEO").

  Based on the language of the Master Agreements, it is not clear that Plaintiffs are entitled to fees as a contractual matter for pursuing the audit.  But, as Plaintiffs point out, ERISA also provides for fees under 29 U.S.C. §§ 1132(g)(2) and (1).  At the very least, this Court has discretionary authority to award fees under § 1132(g)(1).  The Court finds, in the exercise of its discretion, that fees (as well as costs) are justified, particularly as Plaintiffs made a good faith effort to get PDI to comply with an audit, there is an interest in ensuring that employers comply with audit provisions, and PDI's conduct in the proceedings was the reason why many hours were incurred by Plaintiffs' counsel and staff.[3]  Because the fees and costs are not facially unreasonable, the Court grants the request for relief.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

---

[3] In this regard, the Court takes note that, at the time Plaintiffs filed their first motion for default judgment in April 2024, they sought only (approximately) $14,000 in fees and $2,000 in costs. *See* Docket No. 51-8 (Prop. Order).

11

### III. CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion for default judgment. Plaintiffs are awarded liquidated damages in the amount of $373.56, and interest in the amount of $312.13 due to the late-paid contribution for September 2019. In addition, PDI must submit to an audit for the period January 2014 through December 2021. Finally, the Court awards Plaintiffs $42,322 in attorneys' fees and costs of $3,141.70.

It appears that Plaintiffs are also asking the Court to retain jurisdiction so that, if the audit reveals more monies are due, Plaintiffs can return to the Court for relief. *See* Prop. Order. The Court shall enter a final judgment now but this does not preclude Plaintiffs moving from moving to alter or amend the judgment if needed.

The Clerk of the Court is instructed to enter a final judgment in accordance with this order and close the file in the case.

This order disposes of Docket No. 51.

**IT IS SO ORDERED**.

Dated: April 21, 2025

_____
EDWARD M. CHEN
United States District Judge